UNITED STATES of America, Plaintiff-Appellee,

v.

Clifford HOWARD (83–5434, 83–5533), and Charles Wayne Shelton (83–5436, 83–5534), Defendants-Appellants.

Nos. 83–5434, 83–5436, 83–5533 and 83–5534.

United States Court of Appeals, Sixth Circuit.

Argued June 14, 1984.

Decided Jan. 11, 1985.

C. David Hagerman (argued), Williams & Hagerman, Robert F. Houlihan, Ashland, Ky., for Howard.

Louis DeFalaise, U.S. Atty., Fred A. Stine, V, Asst. U.S. Atty. (argued), Lexington, Ky., for U.S.

Robert Templeton (argued), E.J. Walbourn, Hermansdorfer & Templeton, Ashland, Ky., for Shelton.

Before ENGEL and MARTIN, Circuit Judges, and SWYGERT, Senior Circuit Judge.[*]

SWYGERT, Senior Circuit Judge.

Defendants Clifford Howard ("Clifford")[1] and Charles Wayne Shelton ("Charles") appeal from their convictions in the United States District Court for the District of Kentucky for conspiracy and mail and wire fraud. The indictment alleged that defendants conspired with Harriet Shelton Howard ("Harriet") (wife of defendant Clifford and sister of defendant Charles) and Johnny Howard ("Johnny") (unrelated to the other Howards) to defraud Grange Mutual Casualty Company by burning the residence of Clifford and Harriet. The indictment alleged that the residence was burned by Charles with the assistance of Johnny. The indictment further charges that the scheme continued after the fire with substantive acts of mail and wire fraud in an attempt to perfect the claim for insurance proceeds on the fire loss.

The case was referred by the district court to a magistrate for consideration of various pretrial matters. After a hearing, the magistrate found that the tape recording of conversations between Charles and Johnny did not implicate Charles' sixth amendment rights and that the tapes met the authenticity and accuracy requirements set forth in *United States v. Starks*, 515 F.2d 112, 121 n. 11 (3rd Cir.1975). The magistrate recommended that the defendants' motion to suppress the tapes be denied, Magistrate's Report and Recommendation filed October 15, 1982, and the district court adopted this recommendation, Order filed December 23, 1982.

The case was tried to a jury. After ten hours of deliberation, the jury found defendants guilty on all counts. Defendants thereafter filed a motion for a new trial on the ground that one juror deliberately concealed material information on voir dire. Defendants also moved for a new trial on the ground that two other jurors were exposed to extraneous prejudicial information. The motion was referred to the magistrate who recommended that a new trial be granted on the basis that a juror deliberately concealed information on voir dire. The magistrate recommended that the motion for a new trial be denied in all other respects. Magistrate's Report and Recommendation filed May 20, 1983. After additional testimony in the district court, the court concluded that a new trial was not warranted on any grounds. Opinion and

---

[*] The Honorable Luther M. Swygert, Senior Circuit Judge of the United States Court of Appeals for the Seventh Circuit, sitting by designation.

[1] Because of the reoccurrence of last names, we will refer to the alleged conspirators and members of their families by their first names.

Order filed June 9, 1983; Findings of Fact, Conclusions of Law, and Order filed July 20, 1983. The defendants were sentenced to ten years each with five years probation following their release from prison.

Defendants argue on appeal that: (1) the district court erred in denying their motion for a new trial on the ground that a juror deliberately concealed information on voir dire; (2) the district court abused its discretion by denying their motion for a new trial on the ground that another juror was shown to lack impartiality; (3) the court erred in permitting the United States to introduce tape recordings of conversations between Charles and Johnny which were held in violation of Charles' sixth amendment right to counsel; (4) the court erred in admitting evidence illegally seized from the Howards' residence; and (5) the court erred in admitting out-of-court statements of Charles and Johnny against defendant Clifford.

## I

Sandra Rae Huffman was impaneled as an alternate juror but replaced a regular juror who was dismissed for illness. During voir dire, defense counsel asked whether any of the prospective jurors had "any relatives or close personal friends ... who happen ... to be a law enforcement officer?" Excerpted Transcript of Voir Dire on February 28, 1983 at 66. At least six persons responded affirmatively and were subjected to additional questioning. *Id.* at 66–70. Huffman did not respond. At the posttrial hearing, Huffman admitted that her brother-in-law was an officer with the Portsmouth, Ohio Police Department at the time of the trial and that she considered him a relative. When asked why she did not respond to the question, Huffman stated:

Well, they were asking, in other words, if it would have any effect if I was chosen to sit on the jury, would it make a difference in what I decided. It wouldn't have any effect whatsoever, and he was in the State of Ohio, and I just—this was my first time being called to jury service,

and I just didn't realize that it would be important, you know, that I didn't mention his name.

Transcript of Magistrate's Hearing on April 29, 1983 at 80. Huffman gave similar responses each time she was asked why she failed to respond to the question on voir dire. *See id.* at 82, 88.

Defendants argue that bias on the part of Huffman must be presumed as a matter of law under the rule set forth in *McCoy v. Goldston*, 652 F.2d 654 (6th Cir.1981). In *McCoy*, this court stressed the importance of peremptory challenges, *id.* at 657–58, and found that the right to the exercise of such challenges is prejudicially impaired by a prospective juror's deliberate concealment of information on voir dire, *id.* at 658. The court concluded that bias must be presumed and a new trial granted "when a juror deliberately concealed information or gave a purposefully incorrect answer." *Id.* at 659. *McCoy* set forth three factors to be considered in determining whether a juror has deliberately concealed information or purposefully given an incorrect answer:

A. Whether the question asked sufficiently inquired into the subject matter to be disclosed by the juror.

B. Whether the response of other jurors to the question asked would put a reasonable person on notice that an answer was required.

C. Whether at any time during the trial the juror became aware of his false or misleading answer and failed to notify the district court.

*Id.* at 658–59 (footnotes omitted).

The government argues that *McCoy* has been limited if not overruled by Supreme Court decisions in *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), and *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984). *Cf. United States v. Pennell*, 737 F.2d 521 at 533 n. 11 (6th Cir.1984) (after *Phillips*, a "hearing at which the defendant bears the burden of proving actual bias ... is adequate in most cases involving ... juror

misconduct"). In *Smith, supra,* the Court held that the due process clause does not require the district court in a habeas proceeding to presume bias on the part of a juror in a state criminal proceeding who had an application for employment pending in the state prosecutor's office. 455 U.S. at 214–18, 102 S.Ct. at 944–46. In *McDonough,* a plurality of the Court held that a new trial is warranted only where a party demonstrates "first ... that a juror failed to answer honestly a material question on *voir dire,* and then further ... that a correct response would have provided a valid basis for a challenge for cause." 104 S.Ct. at 850. Two Justices concurred in the judgment only and three Justices joined a concurring opinion which stated that bias may be presumed in some cases. *Id.* (Blackmun, J., with whom Stevens, O'Connor, JJ., join, concurring); *id.* (Brennan, J., with whom Marshall, J., joins, concurring in judgment).

■ We need not decide whether these cases overrule *McCoy v. Goldston, supra,* because we find that even under *McCoy,* implied bias is not warranted in the instant case. Defendants have failed to prove that Huffman deliberately concealed information. *McCoy* involved a voir dire question almost identical to that involved in the instant case. The juror in *McCoy* gave no response to the question although her son was training to become a probation officer. The court found this evidence sufficient to establish a prima facie case of deliberate concealment by the juror and to require a posttrial hearing at which the juror could be examined. 652 F.2d at 659. The court did not find the evidence necessarily sufficient to require a new trial.

We do not doubt that the defendants in the instant case established a prima facie case of deliberate concealment by Huffman under the criteria established in *McCoy.* Thus, the court was required to hold a posttrial evidentiary hearing. The court held such a hearing. On the basis of the evidence adduced at the hearing, the court found that "Huffman's failure to respond was an honest mistake. Huffman failed to

respond because she honestly believed that she did not have to answer the question." Opinion and Order filed June 9, 1983 at 6. We find no error in the district court finding.

Huffman testified that she did not intend to conceal information and did not know she was misleading the court. She explained that she concluded for herself that the question was intended to find out only whether her judgment would be affected by a relative's employment as a police officer. She then concluded that her brother-in-law's employment would not affect her judgment and therefore did not respond to the question. Huffman was wrong to decide for herself what information was important. Nevertheless, her testimony was sufficient to rebut the defendant's prima facie case of deliberate concealment. First, defendants failed to establish the third factor listed in *McCoy.* Huffman claimed that she did not realize before or during the trial that her failure to respond to the question was false or misleading. Second, Huffman's stated understanding of the question is credible given the entire course of the voir dire questioning. Prior to the question whether anyone had a close friend or relative who was a law enforcement officer, the government attorney asked the members of the venire whether anyone had prior contact with the Kentucky State Police. Those persons who responded affirmatively were asked whether the contact left them with a particularly favorable or unfavorable impression or whether the contact would affect their judgment if they were chosen to sit on the jury. Transcript of Voir Dire on February 28, 1983 at 27–34. The prospective jurors were then asked by defense counsel whether anyone felt that the testimony of a law enforcement officer was inherently more believable or entitled to greater weight than the testimony of an ordinary citizen. *Id.* at 56. No one responded affirmatively to this question. Finally, those who responded affirmatively to the question whether anyone had a close friend or relative who was a law enforcement officer were subsequently asked only whether the relationship would influence

their decision or cause them concern if they were chosen to sit on the jury. They all responded negatively to the second question and were permitted to continue as prospective jurors. *Id.* at 66–70. This evidence supports the district court's conclusion that "Huffman's failure to respond was an honest mistake." Opinion and Order filed July 9, 1983 at 6.

## II

On voir dire, the prospective jurors were asked if they knew any members of the defendants' families, but no names were mentioned. Tamyra Black did not respond to the question and was selected as a juror. After trial, it was learned that Black and her family had previous contacts with the defendants and members of their families. Black attended high school with Sonja Howard, the daughter of Clifford. Black testified at the posttrial hearing that she became aware of her acquaintance with Clifford's daughter when Sonja testified at trial. Black claimed that she recognized Sonja from high school days but could recall no specific contact with Sonja and had no basis to form an opinion about her. Transcript of Magistrate's Hearing on April 29, 1983 at 93–95. Sonja, on the other hand, testified that an incident occurred in high school which caused Black to feel ill-will towards Sonja. *Id.* at 29–30. Clifford's son, Franklin Elmo Howard, also attended high school with Black. Black testified that she did not know Franklin from high school. *Id.* at 96–97. Franklin testified, however, that he had an angry encounter with Black in high school as a result of a fight he had with Black's high school boyfriend. *Id.* at 22–27. Black also had a connection with the father of defendant Charles. Black's brother had negligently destroyed property belonging to the father for which Black's parents were required to pay damages. Black testified that her father mentioned at the beginning of the trial that he knew one of the defend-

ants but that she did not realize that Charles' father owned the property destroyed by her brother until after the trial had ended. *Id.* at 98–102, 117. Finally, Black received an anonymous telephone call during the trial asking if she was a juror on the case. Transcript of District Court Hearing on July 5, 1983 at 33–35.

■■■ Defendants do not allege that Black deliberately concealed material information on voir dire. Thus, the *McCoy* rule of implied bias is inapplicable. Defendants were required to prove actual bias with respect to Black. *See McCoy v. Goldston, supra,* 652 F.2d at 659. They must "demonstrate 'the actual existence of such an opinion in the mind of the juror as will raise a presumption of partiality.'" *Murphy v. Florida,* 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975). "[A] trial judge's finding of impartiality should be set aside only upon a showing that prejudice is manifest." *Haney v. Rose,* 642 F.2d 1055, 1060 (6th Cir.), *cert. denied,* 452 U.S. 908, 101 S.Ct. 3036, 69 L.Ed.2d 409 (1981);[2] *cf. United States v. Pennell, supra,* at 532–533 (adopting abuse of discretion standard of review of trial court's decision not to grant a mistrial for alleged unauthorized contact with jurors); *United States v. Sisk,* 629 F.2d 1174, 1179 (6th Cir.1980), *cert. denied,* 449 U.S. 1084, 101 S.Ct. 871, 66 L.Ed.2d 809 (1981) ("Ordinarily a trial judge's estimate of jury prejudice is accorded 'the highest degree of respect.'"). The district court found Black's testimony credible and that she sat as an impartial juror. Findings of Fact, Conclusions of Law, and Order filed July 20, 1983. Defendants have offered no evidence to rebut the district court's credibility finding and have not made the very high showing of prejudice necessary for this court to overturn the district court's determination.

## III

The indictment in the instant case charged that defendant Charles Shelton,

---

**2.** Although *Murphy v. Florida, supra,* and *Haney v. Rose, supra,* dealt with habeas petitions alleging jury partiality in state proceedings, this circuit has applied the same standards in federal

proceedings. *See United States v. Giacalone,* 588 F.2d 1158, 1163 (6th Cir.1978), *cert. denied,* 441 U.S. 944, 99 S.Ct. 2162, 60 L.Ed.2d 1045 (1979).

with the assistance of unindicted coconspiratory Johnny Howard, deliberately set fire to the residence of Clifford and Harriet Howard. Thereafter, Johnny became a government informant in return for a grant of immunity in the instant case and an agreement that he would not be prosecuted for various other criminal offenses. The government also enrolled Johnny for a while in the federal witness protection program. As a part of Johnny's agreement with the government, Johnny arranged to meet with defendant Charles and to record their conversations. Johnny was instructed to discuss particular offenses with Charles in an attempt to gather incriminating statements.

 Defendants claim that these conversations violated Charles' sixth amendment right to the assistance of counsel. Defendants rely primarily on *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). In *Henry*, the defendant was indicted for armed robbery and was confined in jail pending trial. Federal agents contacted an inmate confined in the same cellblock as the defendant and offered to pay the inmate for furnishing incriminating statements by the defendant. At trial, the inmate testified about the defendant's incriminating statements. The Supreme Court held that the government violated the defendant's sixth amendment right to counsel "[b]y intentionally creating a situation likely to induce [defendant] to make incriminating statements without the assistance of counsel...." *Id.* at 274, 100 S.Ct. at 2189. The court found three factors important in determining that the government "deliberately elicited" incriminating statements from defendant: (1) the inmate was acting under instructions as a paid informant for the government; (2) the informant "was ostensibly no more than a fellow inmate of [defendant]"; and (3) the defendant was in custody and under indictment at the time he was engaged in conversation by the informant. *Id.* at 270, 100 S.Ct. at 2186. The Court noted that the defendant's incarceration, while a "relevant factor," does not imply a "custody requirement" for sixth amendment rights to at-

tach. *Id.* at 273 & n. 11, 100 S.Ct. at 2188 & n. 11. Indictment or some formal filing of charges, however, is required before sixth amendment rights are triggered. *Id.* at 269–70, 272, 100 S.Ct. at 2186–2188; *see also Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972) (sixth amendment right to counsel attaches "at or after the initiation of adversary judicial proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment"). Thus, the Court explained in *Henry:* "It is quite a different matter when the Government uses undercover agents to obtain incriminating statements from persons not in custody but suspected of criminal activity prior to the time charges are filed." 447 U.S. at 272, 100 S.Ct. at 2188. Preindictment claims are covered by the fourth and fifth amendments. *Id.; see also United States v. Muzychka*, 725 F.2d 1061, 1069 (3d Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 2390, 81 L.Ed.2d 348 (1984) ("Until adversary judicial proceedings have commenced, coercive methods of eliciting information from a defendant are governed by *Miranda* and due process and self-incrimination analyses."). Defendants raise no fourth or fifth amendment claim before this court.

 All of the circuits including this one have held that the sixth amendment right to counsel does not attach until adversary judicial proceedings have commenced. *See, e.g., United States v. Muzychka, supra,* 725 F.2d at 1068–69; *United States v. Franklin*, 704 F.2d 1183, 1189 (10th Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 146, 78 L.Ed.2d 137 (1983); *United States v. Hansen*, 701 F.2d 1215, 1220 (7th Cir.1983); *United States v. Brown*, 699 F.2d 585, 589 (2d Cir.1983); *United States v. Hamilton*, 689 F.2d 1262, 1275 (6th Cir.1982), *cert. denied,* 459 U.S. 1117, 103 S.Ct. 753, 74 L.Ed.2d 971 (1983). Although there might be room in some cases to question when adversary judicial proceedings have commenced, *see, e.g., United States v. Muzychka, supra,* 725 F.2d at 1068–69, we find no such question in this case. Charles was

only a target of the government's investigation at the time of his conversations with the government informant; he was not under arrest and no indictment or other formal charges had been filed. Thus, his sixth amendment rights had not attached.

## IV

The charred remains of the Howard residence were extensively investigated by both state police and the Howards' insurer. The investigators for both the police and the insurance company were looking for evidence of arson, albeit for different reasons, and the investigators cooperated with each other in the investigation. The police investigator spoke to Clifford Howard before entering the premises but obtained neither express consent nor a warrant to conduct his search. The insurance company investigator entered the premises pursuant to a clause in the insurance contract permitting fire investigations.

At trial, the government attempted to introduce the testimony of the police investigator regarding his investigation. Defendants objected to this testimony as the fruit of an unlawful search because the police had obtained neither consent nor a warrant before entering the property. The trial court sustained defendants' objection. Excerpted Transcript of Trial on March 1–4, 1983, vol. I at 35–37. The court, however, permitted the government to introduce the testimony of the insurance company investigator. *Id.* at 56–73. The defendants object to the admission of this testimony. Although a private citizen generally is not subject to the strictures of the fourth amendment, defendants argue that the search of the premises was conducted and directed by the police with the insurance company investigator acting merely as an agent of the government. If the private investigator was acting as "an 'instrument' or agent" of the government, then all evidence resulting from the search must be suppressed. *Coolidge v. New Hampshire,* 403 U.S. 443, 487, 91 S.Ct. 2022, 2049, 29 L.Ed.2d 564 (1971).

We agree with defendants that a consent clause in an insurance contract does not insulate from the fourth amendment a search by a private investigator who acts as an agent of the government to gather incriminating evidence for use in a criminal proceeding. First, the consent contemplated by an insured who agrees to a consent clause is consent to search for evidence relating to the insurer's liability. An insured does not contemplate consenting to a search of his home for any and all reasons. *Cf. Zap v. United States,* 328 U.S. 624, 629, 66 S.Ct. 1277, 1279, 90 L.Ed. 1477 (1946) (assuming that consent to search did not imply consent to seize item). Moreover, because an insured may be or may feel compelled to agree to a consent provision to obtain the insurance policy, we are not convinced that this consent meets the criteria of voluntariness, *see Schneckloth v. Bustamonte,* 412 U.S. 218, 248, 93 S.Ct. 2041, 2058, 36 L.Ed.2d 854 (1973) ("[T]he Fourth and Fourteenth Amendments require that [the state] demonstrate that the consent [to search] was in fact voluntarily given, and not the result of duress or coercion, express or implied.").

We find, however, that the insurance company investigator while cooperating with the police was not acting as an agent of the government. In *United States v. Walther,* 652 F.2d 788, 792 (9th Cir.1981), the Ninth Circuit found that "two of the critical factors in the 'instrument or agent' analysis are: (1) the government's knowledge or acquiescence, and (2) the intent of the party performing the search." In the instant case there is no question that the government had knowledge of, and even participated in, the search. Nevertheless, where, as here, the intent of the private party conducting the search is entirely independent of the government's intent to collect evidence for use in a criminal prosecution, we hold that the private party is not an agent of the government. *See also United States v. Capra,* 501 F.2d 267, 272 n. 4 (2d Cir.1974), *cert. denied,* 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975) ("when police are merely assisting a private party, who has au-

thority to search and a legitimate need to do so, ... courts are reluctant to exclude resulting evidence"); *cf. Stone v. Wingo*, 416 F.2d 857, 860 (6th Cir.1969) (actions of private party attributed to state where " 'parties act ... together, in pursuance of some design or in accordance with some scheme' "); *Metheany v. United States*, 365 F.2d 90, 94 (9th Cir.1966) (evidence obtained by a trustee pursuant to a warrant from a bankruptcy court is admissible in a criminal proceeding where the trustee was "primarily motivated by his lawful duty to investigate the bankrupt's affairs and collect the assets of the estate, [not] by a desire to commit a wrongful act"). The insurance company investigator was rightfully on the property to determine the liability of the insurance company and his actions are not attributable to the government. Thus, the district court did not err in admitting his testimony.

## V

We do find merit in defendant's final claim. We hold that the admission into evidence against Clifford of the tape recorded conversations between Charles and Johnny [3] violated Fed.R.Evid. 802 which

---

3. The relevant portions of the conversations are as follows:

Conversation between John Howard and Charles Shelton, dated May 9, 1981.

JH: Right. What, oh hell I was gonna say, whatscallit, wanted me to go do a damn burn a house.
CS: Who did?
JH: What's the guy's name. Stanley? That deputy sheriff?
CS: Yeah Ray Stanley. Tall slim boy?
JH: Yeah.
CS: Why have you been dealing with him?
JH: No I just met him. They just said I'd do anything for a dollar.
CS: Who'd, who'd you meet him through?
JH: Down as Holbrook's. What's his name?
CS: Don't do it. Don't fuckin do it.
JH: OK.
CS: Don't do it. What the mother-fuckers are probably trying to do, probably trying to set you up into something else.
JH: Yeah. Yeah. Wasn't gonna do it.
CS: See and Bill knows about these insurance houses.
JH: Insurance houses?
CS: He don't know that me and you have burned any, but he knows that I had the contact to do some of these houses.
JH: Oh. I don't know nothing about them houses.
CS: Well I know that. But that I'm saying is don't even go burn no fuckin house down.
JH: Shit I wouldn't burn nothin. I was just said, you know, if you know'd the guy.
CS: Yeah I know him.
JH: I know that last incident, my Goddamn it, we blowed our fuckin self up.
CS: So, don't, don't even, don't even go fuckin do nothin.
JH: Right.

Conversation between John Howard and Charles Shelton, dated May 12, 1981.

JH: Did you find out anything about it, how's your sister make out?
CS: Oh, she's maintaining, you know, staying straight.

JH: Is she? She ever get a settlement?
CS: Not yet.
JH: Goddamn. Well she should.
CS: She if they get that fuckin settlement, see I've got 8 thousand dollars coming on that fuckin settlement.
JH: Supposedly.
CS: Well, 6 to 8. Man garan ..., here's what he guaranteed me five. He guaranteed me. He said Goddamn said I'll give you five grand.
JH: For what?
CS: Nothing, Well, not exactly nothing. There was something else involved.
JH: Yeah, yeah. Better off (pause) I know.
CS: You, I don't know whether he's jacking his fuckin leg or what.
JH: I just wondered if she ever got a.
CS: No, but they ain't settled a fuckin thing. They was supposed to come, (inaudible) ... little bit closer.
JH: Yeah.
CS: They're supposed to come in there and dig every fuckin thing up. Hunting for dynamite.
JH: Dig it up?
CS: I said yeah, I said well Goddamn it tell 'em there ain't no fuckin dynamite involved. Cause I know they ain't.
JH: Shit you and me both know that. You and your 40 fuckin gallons of gas. 40. I couldn't believe you had that much gas.
CS: By God it burned down didn't it?
JH: It didn't burn, it blowed, mother fuck. You should never put 40 gallons in there.
CS: I told him I said hey, I said take my word for it and I'll give you a deposition they ain't no, ain't no fuckin dynamite involved. It's all gasoline. He said fuck you, I can't do that, Goddamn it. He said they want to come in here and look for it. He said I gotta let 'em come in here and look for it.*
JH: Yet but how come you used 40 fuckin gallons?
CS: I wanted to make sure that mother fucker came down. Have they ask you any more about fuckin Stanley?
JH: No.

prohibits the admission of hearsay in the federal courts except as provided by the Federal Rules of Evidence.[4]

The district court admitted the tapes against Clifford pursuant to Fed.R.Evid. 801(d)(2)(E) which provides: "A statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."[5] We find that the recorded conversations fail to satisfy the requirements for the admission of coconspirators' statements. In *United States v. Enright*, 579 F.2d 980, 986 (6th Cir.1978), this court held that for statements to be admissible pursuant to Rule 801(d)(2)(E) the government must show by a preponderance of the evidence three elements: (1) a conspiracy existed; (2) the defendant against whom the hearsay is admitted was a member of that conspiracy; *and* (3) the hearsay statement was made in the course and furtherance of

the conspiracy. *See also United States v. Hamilton*, 689 F.2d 1262, 1268 (6th Cir. 1982), *cert. denied*, 459 U.S. 1117, 103 S.Ct. 753, 74 L.Ed.2d 971 (1983); *United States v. Vinson, supra*, 606 F.2d at 152. Defendants argue only that the government has failed to establish the third element of *Enright*.[6]

■■■ We reject defendants' claim that the recorded statements were not made during the course of the conspiracy. Hearsay statements made after a conspiracy has terminated are not admissible in the federal courts. *See Krulewitch v. United States*, 336 U.S. 440, 442–43, 69 S.Ct. 716, 717–18, 93 L.Ed. 790 (1949). A conspiracy is deemed to have ended when the last objective sought is achieved, when all coconspirators have been arrested, or when achievement of the objective has otherwise been rendered impossible. *See Wong Sun v. United States*, 371 U.S. 471, 490, 83

CS: Burn that fuckin place or whatever it was?
JH: No they asked me to burn one.
CS: Yeah I knew that.
JH: I thought about it, cause the money was pretty good.... Like you told me, not to do nothing.
CS: Only thing I'm afraid of, I'm afraid the mother fuckers maybe trying to fuckin set you up.
JH: Yeah. I said no I was under investigation and that's the only thing that kept me out of it.
CS: Tell 'em if they want to wait a couple of fuckin months, ah, you'd be glad to do it.
JH: Me and you would do it. Right?
CS: (Laugh).
JH: Well the price is right.
CS: That will pend them. You know, hold them off.
JH: Yeah. I just told 'em I was under investigation and I didn't want to mess with them. I was just wondering if she got any damn money out of that damn....
CS: No. I ain't got ....
JH: I hate to see her lose her damn place there.
CS: They can't lose nothing. The worst thing that could happen is the mother fuckers come in and close it all out and say hey it belongs to us.

---

\* When asked who "he" referred to, both Charles and Johnny responded that "he" referred to Clifford. *See* Excerpted Transcript of Trial on March 1–4, 1983, vol. II at 330 (testimony of Johnny Howard); *id.*, vol. III at 571 (testimony of Charles Shelton).

4. We note that the admission of the tape recorded conversations raises no constitutional question regarding Clifford's sixth amendment right to confront witnesses. Both Johnny and Charles testified and were available for effective examination regarding their statements, thus satisfying the requirements of the confrontation clause. *See United States v. Green*, 548 F.2d 1261, 1267–68 (6th Cir.1977).

5. Although this circuit does not require an evidentiary hearing or specific findings by the district court before the admission of statements pursuant to Fed.R.Evid. 801(d)(2)(E), *see United States v. Vinson*, 606 F.2d 149, 152–53 (6th Cir. 1979), *cert. denied*, 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980), we are disturbed that the court held no hearing and made no findings in the instant case where the admissibility of the statements is not at all obvious. A hearing or specific findings would have helped the district court to correctly determine the admissibility of the statements and would have facilitated this court's review.

6. Because we find that the government failed to prove the third element of *Enright*, we do not address the first two elements. We note, however, that there is little evidence before this court that Clifford was a part of a conspiracy between Johnny and Charles. The paucity of evidence on the second element causes us considerable concern as we explain *infra* at 231.

S.Ct. 407, 418, 9 L.Ed.2d 441 (1963); *United States v. Hamilton, supra,* 689 F.2d at 1268–69. Defendants claim that their alleged conspiracy involved burning down the house and that the conspiracy ended when the house burned. The government responds, and we believe, that the conspiracy alleged in the instant case was one to defraud the insurance company. The final objective of the conspiracy was to obtain the insurance proceeds, and this objective was still being sought when the recorded conversations took place. Thus, the conspiracy had not ended. *See also United States v. Xheka,* 704 F.2d 974, 985–86 (7th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983) (conspiracy to defraud insurance company does not end when business burns but continues "until defendants obtain the insurance money or abandon their quest").

■ Although we conclude that the recorded conversations took place during the course of the conspiracy, we cannot find that the statements were made in furtherance of the conspiracy. The statements did nothing to advance what we have determined to be the remaining objective of the conspiracy, which was to obtain the insurance proceeds. *Cf. United States v. Xheka, supra,* 704 F.2d at 986 (statements intended to keep coconspirator in the conspiracy were made in furtherance of the conspiracy); *United States v. Hamilton, supra,* 689 F.2d at 1269–70 (orders to purchase stolen goods placed by coconspirator and statements concerning plans to collect money on orders were made in furtherance of the conspiracy to traffic in stolen goods); *United States v. Lang,* 589 F.2d 92, 100 (2d Cir.1978) (statement by coconspirator to uncover agent posing as potential buyer of counterfeit bills revealing that another coconspirator had been arrested with counterfeit money and warning agent to be careful was not in furtherance of conspiracy to distribute counterfeit bills); *United States v. Wilson,* 490 F.Supp. 713, 717 (E.D.Mich. 1980) ("Narrative declarations ... have never been considered to be made in furtherance of a conspiracy."), *aff'd,* 639 F.2d 314 (6th Cir.1981).

■ The government argues that the statements contained in the taped conversations were directed at avoiding detection. In *Krulewitch v. United States, supra,* 336 U.S. at 443–44, 69 S.Ct. at 718, the Supreme Court held that declarations made after a conspiracy has terminated in an attempt to prevent detection are not statements made in furtherance of the main conspiracy and are inadmissible under the federal rules. *See also Grunewald v. United States,* 353 U.S. 391, 401–02, 77 S.Ct. 963, 972, 1 L.Ed.2d 931 (1957); *Lutwak v. United States,* 344 U.S. 604, 616–18, 73 S.Ct. 481, 488–89, 97 L.Ed. 593 (1953). The government tries to distinguish *Krulewitch* from the instant case. Avoiding detection, according to the government, was not merely "an implicit subsidiary phase of the conspiracy," *Krulewitch v. United States, supra,* 336 U.S. at 443, 69 S.Ct. at 718, but was necessary to achieve the underlying goal of obtaining the insurance proceeds. We might be persuaded if the statements made by Johnny and Charles were directed at avoiding detection by the insurance company. Johnny and Charles, however, discussed only how to avoid detection by the state police. Detection of a continuing illegal conspiracy will always thwart any remaining objectives of the conspiracy. Thus, to accept the government's position before this court would be to hold that statements directed at avoiding detection are admissible anytime that the conspiracy is continuing. The rule enunciated in *Krulewitch,* that avoiding detection is not necessarily a part of the main conspiracy, cannot be construed so narrowly. Some link must be established between the attempt to avoid detection and some remaining objective of the conspiracy. The government must still prove both that a "central aim of the conspiracy ... continued in being" and that the declarations directed at "concealment ... were at least partly calculated to further this aim." *Grunewald v. United States, supra,* 353 U.S. at 415, 77 S.Ct. at 979. The government has failed to establish that the statements contained in the

tape recordings were partly calculated to further the continuing aim of obtaining the insurance proceeds.

The government contends that the "issue" with respect to the course and furtherance requirement is "whether the evidence is basically reliable; whether it is 'fair' to permit its introduction; and, whether the evidence (statement) relates in some way to the conspiracy itself." Brief for the United States at 60. *See also United States v. Smith*, 520 F.2d 1245, 1247 (8th Cir.1975); 4 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 801(d)(2)(E)[01], at 801–169 to 172 (1981). We agree. It is because the statements by Charles and Johnny which incriminate Clifford lack any indicia of reliability and because it is unfair to admit the statements as evidence against Clifford that we find them inadmissible. We are most troubled by the fact that one of the conversants was a government informant who was being rewarded for eliciting incriminating statements. We find entirely unreliable any statements made by the informant. We also find unreliable statements elicited from Charles regarding Clifford's involvement in the conspiracy. Although one is unlikely to adopt incriminating statements concerning oneself, there is no reason to believe that one will necessarily speak out to exculpate another. We are further troubled by the paucity of the evidence (other than the taped conversations) linking Clifford to the conspiracy. The government admits that its case against Clifford was "mostly circumstantial." *See* Brief for the United States at 8. Although we are not prepared to hold that the evidence was insufficient as a matter of law to establish Clifford's involvement in the conspiracy, we cannot disregard the weakness of the evidence in considering the reliability of an alleged coconspirator's out-of-court statements. One can imagine a case in which a person deliberately makes incriminating but untrue statements about another to a known government informant. *Cf. Krulewitch v. United States, supra*, 336 U.S. at 456, 69 S.Ct. at 724 (Jackson, J., concurring) ("Conspirators, long after the contemplated of-

fense is complete, after perhaps they have fallen out and become enemies, may still incriminate each other by deliberately harmful, but unsworn declarations, or unintentionally by casual conversations out of court."). We must rigorously enforce the standards set forth in *Enright* to avoid the admission of unreliable hearsay. *See United States v. Lang, supra*, 589 F.2d at 99–100; 4 J. Weinstein & M. Berger, *supra*, ¶ 801(d)(2)(E)[01], at 801–73 to 74.

Even if we found that the statements made by Charles were admissible as evidence against Clifford, we would have to reverse Clifford's conviction because Johnny's statements were also admitted as evidence against Clifford. Johnny had turned government informant at the time of the taped conversations and thus was no longer a coconspirator. *See United States v. Xheka, supra*, 704 F.2d at 986 n. 6; *United States v. Smith*, 623 F.2d 627, 631 (9th Cir.1980). Johnny's statements were admissible against Charles as adoptive admissions. *See* Fed.R.Evid. 801(d)(2)(B). There is no basis, however, for admitting Johnny's statements against Clifford. *See United States v. Xheka, supra*, 704 F.2d at 986 n. 6. Thus, the district court erred in failing to give a limiting instruction regarding Johnny's statements. *See Lutwak v. United States, supra*, 344 U.S. at 618, 73 S.Ct. at 489.

## VI

For the foregoing reasons, the conviction of defendant Charles Shelton is affirmed and the conviction of Clifford Howard is reversed and remanded.

ENGEL, Circuit Judge, dissenting in part and concurring in part.

I would affirm the convictions of both defendants. I therefore respectfully dissent from part V of the majority opinion which holds that the admission of the tape recordings of the conversations between Johnny Howard and Charles Shelton, as evidence against Clifford Howard, constituted reversible error as to him.

Judge Swygert has very carefully summarized the evidence. My disagreement is with the majority's conclusion that "the government has failed to establish that the statements contained in the tape recordings were partly calculated to further the continuing aim of obtaining the insurance proceeds." I believe that the jury could find that the statements were calculated to further the continuing conspiratorial aim of obtaining the insurance proceeds.

First, it is necessary to remember the relationship of the parties in connection with the taped conversation. Johnny Howard was the informer. Charles Shelton was an alleged conspirator with his sister Harriet and the latter's husband, Clifford Howard, in a plan to burn down Harriet and Clifford's home in order to collect the insurance proceeds. Second, the majority opinion acknowledges that the conversations were made when the conspiracy was still continuing. The conversations were made after the fire but before receipt of the insurance proceeds.

The taped conversation plainly indicates that co-conspirator Charles Shelton was concerned about collecting the insurance proceeds, and specifically his interest in the $8,000 he had coming on the settlement. The gist of the taped conversation between Johnny Howard and Charles Shelton was their concern not to risk any further illicit activity while the investigation was pending because of Clifford's concern that Howard was being "set up" by the police. Shelton told Howard how "They're supposed to come in there and dig every ... thing up. Hunting for dynamite." Shelton stated that he personally knew, apparently from a conversation with Clifford, that there was no dynamite involved, and he acknowledged to Johnny Howard that he had used 40 gallons of gasoline which "didn't burn, it blowed ..." Shelton clearly demonstrated his concern over the ongoing police investigation not only because it might implicate Clifford Howard and himself, but because it would frustrate the payment of the insurance proceeds. I can read the transcript in no other way. In such circumstances, I can see no value to a rule which

holds inadmissible statements of co-conspirators made during the course of a conspiracy when the statements concern not only the criminal investigation and possibility of detection, but also the success of the conspiracy.

The majority opinion expresses some concern about the reliability of the statements. It may be that the statements of Johnny Howard were unreliable since he was an informer, knew that he was being taped, and had an interest in protecting himself. However, no such motive attaches to Charles Shelton, for Shelton did not know at that time that Johnny Howard was an informer. Shelton's testimony, which directly implicates Clifford Howard, therefore has a ring of reliability. Further, Shelton's concern for the welfare of his sister, and about getting his $8,000 cut of the proceeds supports the reliability of the statement. In addition, since Charles Shelton testified, Clifford Howard presumably could have challenged Shelton's testimony through cross-exam. Even if there was a question of reliability, that question is for the jury and not for us.

The majority opinion professes not to address the first two elements of *Enright* (see footnote 6), but then goes on to observe: "We note, however, that there is little evidence before this court that Clifford was a part of a conspiracy between Johnny and Charles." Our court, however, has adhered to the general rule of conspiracy law that once a conspiracy has been established, only slight evidence is required to connect a particular defendant with the conspiracy, provided of course that the evidence is sufficient to satisfy the jury of guilt beyond a reasonable doubt. *United States v. Mayes*, 512 F.2d 637, 647 (6th Cir.1975); *United States v. Chambers*, 382 F.2d 910 (6th Cir.1967). The direct evidence against Clifford Howard is slight, but the circumstantial evidence is quite convincing, construing it as we must, in the light most favorable to the government. *See Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). It was Clifford who, with Charles' sister Harriet,

owned the house which burned and who was a named insured on the fire insurance policy issued by Grange Mutual Insurance Company. Clifford was admittedly in financial difficulties, and shortly before the fire the house had been designated for public sale and mortgage foreclosure. Under those circumstances, it is difficult to see how Harriet's brother could conceivably have hoped to participate in the proceeds to the extent of $8,000 without Clifford's knowledge and participation in the scheme. The absence of Clifford from town and the absence of his wife and children from the home at the time of the fire are consistent with foreknowledge of the planned fire.

In summary, I find no reason for the restriction which the majority would append to the conspiracy exception to the hearsay rule. It has no bearing on the reliability of the hearsay statement itself. The statement is relevant and should be admissible.