[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON DEFENDANT'S MOTION TOSUPPRESS STATEMENTS DATED AUGUST 12, 1996
This is a case in which the defendant, David L. Copas (hereinafter "defendant" or "Copas"), is charged under CGS § 53a-54a with murder in the death of Laura Bieu on April 26, 1986. Defendant has filed five (5) motions to suppress statements of the defendant, both oral and written, given to Connecticut State Police Detective Michael Malchik (hereinafter "Malchik") on April 29, 1986 at defendant's home and at the Coventry police station on April 30, 1986. The fifth motion is to suppress statements made by the defendant in the course of the first prosecution in this matter and in the course of the habeas corpus proceedings which resulted in his being granted a new trial. Hearings were held before this court on January 28, 29, 30, and 31, 1997 in which considerable testimony was taken. Each side filed briefs on March 7, 1997, the state filing five (5) briefs, one in response to each motion, and the defendant filing one brief which addressed all of the motions. The parties then filed reply briefs on March 12, 1997. This court will decide all five motions in this Memorandum of Decision.
Motion number (1), (hereinafter also "I") claims that (1) any statements made by the defendant were not preceded by adequate CT Page 2908 warnings of his rights to remain silent and to have the effective assistance of counsel and (2) that the defendant did not at any time knowingly, voluntarily or intelligently waive said rights.
As for the testimony concerning this motion and motions 2, 3 and 4, the State's principal, witness was Connecticut State Police Detective Michael Malchik, and the defendant's principal witness was Cathy Hoskins, formerly known as Cathy Copas, (hereinafter "Hoskins"), the defendant's wife at the time of the incidents discussed herein and now his former wife.[1] On the issue of credibility which is a significant but not sole basis for the court's decisions herein, the court found Malchik to be considerably more credible than Hoskins. This was based, inter-alia, upon their demeanor and attitude on the witness stand, their memory or lack thereof, the manner in which they answered questions and the inconsistencies in their testimony. The court found Malchik to be very candid and forthright, thoughtful as well as with a good memory of events and sufficiently candid to say so if he could not remember something. He was very professional and direct with good attention to detail and was honest and consistent in his testimony. Hoskins was also honest and forthright but with a lack of memory of certain events because by her own admission, on April 29 and 30, 1986 at the Coventry police station she was distracted by and thinking primarily of the condition of her son whom she had taken that night to Windham Hospital (from which she came to the unfamiliar surroundings at the Coventry police station) and she was upset, confused and not thinking straight while at the Coventry police station. The court also found Detective Roland Pelkey of the Connecticut State Police (hereinafter "Pelkey") who worked with Malchik on this investigation to be more credible than Hoskins for the same reasons the court found Malchik to be more credible than Hoskins. In addition, Pelkey's testimony and recollection of events were consistent with those of Malchik.
As for the individual motions, the court finds as follows:
Motion to Supress I:
A: Statements made by the defendant at his home at or about noon on April 28, 1986: In footnote number 3 on page 5 of defendant's Memorandum dated March 7, 1997, the defendant states that he is not objecting to the admissibility of these statements. CT Page 2909
B: Statements made by the defendant at the Coventry police station: At approximately 10:46 p. m., April 29, 1986 the defendant was taken into custody by the Connecticut State Police (hereinafter "CSP") including Malchik at Windham Hospital in Willimantic, Connecticut pursuant to a valid search warrant for his person. He was advised that he was not under arrest and advised of his constitutional rights under Miranda v. Arizona, 384 U.S. 436 (1966), (hereinafter "Miranda rights"), and the defendant stated that he understood these rights. While the defendant was being transported to the Coventry police station (hereinafter "CPS") for execution of the aforementioned search warrant, the defendant indicated either that he might need an attorney or that he wanted an attorney. He was advised that he could call an attorney at the CPS. Upon arrival at about 11:15 p. m. a telephone was made available to him, he made several calls and advised Malchik and Pelkey that he didn't want to speak to an attorney but did want to speak to his wife. He could not reach his wife directly, and then the execution of the search warrant began. There was no interrogation at that time. At about 11:55 p. m. the defendant's wife, Hoskins, arrived at the CPS[2] and at her request was taken into the room where the defendant was being searched. Hair samples were being collected at that time. Hoskins and the defendant talked privately in that room for twenty minutes until 12:15 a.m. April 30, 1986. Then, Hoskins came out of the room, and the execution of the search warrant continued. A short time later, at approximately 12:40 a.m., Hoskins asked to speak again to the defendant. She was brought to the room where the search warrant was being executed, and she and the defendant again had a private meeting which was then interrupted by Malchik who told the defendant that he, Malchik, and Pelkey wanted to finish the execution of the search warrant. This was at approximately 1 a.m., April 30, 1986. Defendant then told Malchik that he would tell him about the murder of Laura Bieu as long as his wife, Hoskins, could be present. Malchik told him that he, the defendant, would have to initiate a waiver of his right to an attorney because first he had requested an attorney and then he wanted to speak with his wife. Defendant responded that he did not want an attorney, that he trusted his wife's judgment and that he, the defendant, now wanted to talk about the crime. Malchik then read the defendant's Miranda rights to him. Both Hoskins and Pelkey were in the room at that time. The defendant signed and initialed a waiver of all of his Miranda rights. His wife CT Page 2910 signed as a witness to the waiver. This was at approximately 1 a.m. See State's Exhibit D and Suppression Hearing Transcript 1/28/97, pgs. 117-119. See testimony of Pelkey, Suppression Hearing Transcript (hereinafter "SHT"), 1/29/97 pgs. 173-176.
 The defendant then gave an oral confession (statement) with his wife present. He then agreed to tape record his oral statement. The defendant then began his taped statement with a recitation of the top half of state's Exhibit D, the Miranda rights. At the completion of the statement, it was determined that the tape recorder or the tape or both had malfunctioned, and the statement had not been recorded. The same process was repeated with a different recorder and tape. Part way through the electrical cord dislodged. Then a tape recording was done for a third time beginning at 2:32 a.m. and concluding successfully at 3 a.m. In this last tape the defendant read his Miranda rights and then gave his statements confessing to the murder. SHT 1/29/97 pgs. 131-2. See State's Exhibit O-1 and State's Exhibit E, the transcript of the taped confession. His wife was present throughout the giving of the statements. At 3 a.m. the defendant was arrested. Thereafter, he gave a written statement. SHT 1/28/97, pgs. 143-144 and State's Exhibit D-1. The statement form includes a printed recitation of defendant's Miranda rights and a waiver of same above the written statement which was signed by the defendant.
 Based upon the totality of the evidence as well as the totality of the circumstances set forth in such evidence, the court finds:
 1. No interrogation of the defendant took place prior to the defendant's knowing and voluntary waiving of his Miranda rights at 1 a.m. on April 30, 1986.[3]
 2. There was no request by the defendant for an attorney except for his request for same in the car en route from Windham Hospital to the CPS. The court specifically rejects Hoskins's claim to the contrary.
 3. That request was specifically waived at approximately 1 a.m., April 30, 1986.
4. At all times the defendant had the capacity to make CT Page 2911 the confessions he did, as well as the capacity to understand the meanings of his Miranda rights and his waivers of same. The testimony shows that he had several times previously confessed to various crimes and had waived his Miranda rights. He was hardly a "babe in the woods" in regard to custodial interrogation and his Miranda rights. He had obtained his GED, he was 25 years old, able to speak, read and write English competently. He had no recognizable physical or mental impairment and although emotional at times, these emotions were not sufficient to impede his ability to understand the proceedings, the fact that he was confessing to murder or any of the issues or actions with which he was confronted; and were not sufficient to interfere with the voluntariness of his actions.
 5. The defendant voluntarily, knowingly and intelligently waived his constitutional rights, federal and state, as well as his Miranda rights. The state has met its burden of proof that the defendant's statements were voluntarily, knowingly and intelligently made and were made in accordance with due process. There was no coercive conduct on the part of the police or anyone else for that matter in connection with the defendant's statements. The police "scrupulously honored" the defendant's rights against self-incrimination.
For the above reasons the Motion to Suppress I is denied.
Motion to Suppress II:
This motion claims that the defendant's statements were made when he was not legally in custody pursuant to the search warrant of his person. Therefore, they were made when he was illegally detained. This is based, inter-alia, on the claim that the search warrant had been fully executed prior to the defendant's statements.
This, in part, depends upon whether the taking of a blood sample was part of the search warrant for his person. Defendant claims that the warrant authorized only a search of the body's surface and not the extraction of blood from within the body. A review of the search warrant itself, (State's Exhibit K) is helpful. The pertinent part of the warrant signed by Judge Kelly is: ". . . From said affidavit, the undersigned finds that there CT Page 2912 is probable cause for the undersigned to believe that the property described in the foregoing Affidavit and Application iswithin or upon the person, . . . named or described . . . ". Emphasis added. A plain reading of this language is that the court found probable cause to believe that the defendant's "blood" (which was included in the list of items to be seized on both the affidavit and on the warrant itself) was blood within
the body of the defendant. Accordingly, the warrant on its face authorizes the extraction of blood from within the defendant's body.
Assuming arguendo that it is not clear on its face, the court finds that based upon the warrant, the application for same and the officers' affidavit taken together and with the testimony of both Malchik and Pelkey, it is clear that any possible ambiguity should be and is resolved by concluding that the warrant authorized the extraction of blood from the defendant's body. SeeState v. Santiago, 8 Conn. App. 290 (1986) and State v. Vallas,16 Conn. App. 245 (1988).
Further, the court rejects defendant's claims that the entire warrant should have been executed at Windham hospital where the defendant was taken into custody pursuant to the warrant and that the extraction of blood should have taken place first when the police and the defendant were still at the hospital. The officers had the discretion as to where the warrant should be executed and the order in which it was to be executed. Their choice merely has to be reasonable. Illinois v. Rodriquez, 497 U.S. 177 (1980) andU.S. v Montoya de Hernandez, 473 U.S. 531 (1985). The officers not being familiar with the layout of Windham hospital nor having permission to use it for full execution of the warrant, it was reasonable to execute it at the CPS which was being used as the center or command post of their investigation. Both Malchik and Pelkey testified that a blood sample was customarily the last item to be taken in the execution of a search warrant. The court finds that to be a reasonable approach to the execution of the warrant, and to return to Willimantic from Coventry, which is a short distance away, to extract the blood is certainly reasonable under the circumstances.
Finally, defendant claims that the delay in fully executing the warrant made the detention of the defendant unreasonable and illegal in violation of his constitutional rights. The court disagrees. The defendant arrived at the CPS at 11:15 p. m. The one and three quarter hours between then and the time of the CT Page 2913 statement at 1:00 a.m. is not unreasonable when taking into account the defendant's several telephone calls upon first arriving and the two periods in which the defendant and his wife met privately (twice for 20 minutes for a total of 40 minutes). That would result in the execution of the warrant at CPS taking no more than one hour. This is hardly unreasonable. The court does not ascribe the same motivation to Malchik and Pelkey for allowing Hoskins and the defendant to meet privately as does the defendant. Hoskins coming to the CPS was initially at the behest of the defendant who presumably wanted to meet with her. After that both requests for a meeting were made by Hoskins. The court rejects that there was an ulterior motive of Malchik and Pelkey to have her meet with the defendant, namely to use her as a means to persuade the defendant to confess. Although Malchik and Pelkey were not obligated to permit these private meetings, they did so in order to be kind to and to accommodate Hoskins and the defendant. The delays were in fact caused by the defendant and Hoskins, and under U.S. v. Montoya de Hernandez, supra, these delays are not chargeable to the police.
Therefore, based upon the totality of the evidence and the circumstances, the court finds that the search warrant was properly executed and that the defendant was legally detained thereunder until he was arrested. Between 1 a.m., April 30, 1986, and defendant's arrest at 3 a.m. he was properly detained both by the search warrant and the procedures aforementioned to comply with his request to give statements about the crime. After his arrest, he was, of course, legally detained which included the time of taking the blood sample at the hospital.
Although the court has to go no further, it, nonetheless, does find that the defendant was lawfully detained prior to his confession because the CSP had probable cause to arrest him. This is based upon what is contained in the affidavit for the search warrant (State's Exhibit K) and the facts described at the suppression hearing before this court which were known to the CSP when the defendant was in custody pursuant to the search warrant. Due to such probable cause existing as aforesaid, the defendant was legally in custody between 10:46 p. m. on April 29, 1986 and 1 a.m. on April 30, 1986 for that reason as well as for the execution of the search warrant.
Accordingly, for the reasons stated the Motion to Suppress II is denied. CT Page 2914
Motion to Suppress III:
According to defendant's memorandum this motion specifically depends on the claim that the defendant invoked his right to counsel and that the police thereafter failed to scrupulously honor such invocation.
For the reasons set forth herein for denying Motion to Suppress I, this Motion to Suppress III is also denied.
Motion to Suppress IV:
This motion claims that the CSP used the defendant's wife, Hoskins, as an agent for the purpose of interrogating him after his invocation of his right to an attorney. The issue, therefore, is whether Hoskins was an agent of the CSP (the state).
In evaluating that, the court has to determine (1) whether Hoskins was performing a function akin to a governmental function such as criminal investigation and (2) whether Hoskins was acting on the order, instruction, or request of a government officer (i.e. a member of the CSP, in this case either both Malchik and Pelkey or either of them. See State v. Lee, 32 Conn. App. 84
(1993). Also, U.S. v. Howard, 752 F.2d 220 (6th Cir.) (1985).
Based upon the totality of the evidence and the totality of the circumstances, the court finds the following:
 1. The reason Hoskins came to the CPS was at the request of the defendant which request was transmitted to her through the defendant's mother.
 2. The two private meetings between Hoskins and the defendant were initiated by Hoskins and/or the defendant.
 3. The CSP did not request or direct Hoskins to either meet with the defendant or to persuade him to confess. She was not promised anything or in any way intimidated to meet with the defendant or persuade him to confess.
 4. Comments allegedly made by Pelkey and/or Malchik to or in Hoskins's presence did not rise to the level of requesting, soliciting or directing Hoskins to do anything in regard to meeting with the defendant or CT Page 2915 persuading him to confess. Further, Hoskins never testified that she had been asked to persuade the defendant to confess.
 5. Hoskin's actions were not intended to assist the CSP in their investigation. Hoskins testified that her purpose in talking to the defendant was to know the truth for her own benefit, to know whether the defendant had killed Laura Bieu, and when he did tell her what happened, to tell him to confess because it was the right thing to do.
 6. Hoskins was acting because of her private motivation, rather than to assist the police. Also, she had not been directed, solicited or requested by the CSP to either meet with the defendant or persuade him to confess.
 7. Therefore, the defendant has not sustained his burden under Lee and Howard, supra. The court, therefore, concludes that Hoskins was never acting as an agent of the CSP.
Accordingly, the Motion to Suppress IV is denied.
Motion to Suppress V:
This motion seeks to suppress statements made by the defendant at the first prosecution of the subject charge and the testimony given by the defendant at his habeas corpus trial which was held on January 21, 22, 23 and 29, 1992.
Although this is what the motion seeks, the defendant's memorandum makes claims only in regard to the testimony at the habeas trial. Therefore, the part of the motion seeking to suppress statements at the first prosecution not being briefed is deemed abandoned.
The claim to suppress defendant's habeas testimony is based upon three reasons: (1) The defendant is entitled to immunity under the holding of Simmons v. United States, 390 U.S. 377
(1968), (2) the defendant was not advised prior to his giving incriminating testimony that it might be used against him if his habeas were successful and he was granted a new trial and (3) that the habeas canvas was not sufficient to establish a waiver CT Page 2916 of the defendant's right against self incrimination.
The defendant claims that he has been unable to find any case law directly on point with the facts of this case. On that basis this part of the case would appear to be one of first impression.
In the first claim, defendant relies on the holding inSimmons, supra, that a defendant is entitled to "use immunity" for testimony that he gives in a suppression hearing concerning an alleged unreasonable search and seizure. The suppression hearing was based upon a claim of violation of the defendant'sfourth amendment rights guaranteed under the United States Constitution. In that case a co-defendant named Garrett had to admit ownership of a seized suitcase in order to have standing to assert his fourth amendment rights, and then the government presented that testimony in the case against him on the issue of guilt. The court characterized Garrett's position as a "dilemma" which was either give up his right under the fourth amendment or give up his right against self-incrimination under thefifth amendment to the United States Constitution. The court found it intolerable that one constitutional right should have to be surrendered in order to assert another, although this ruling has not been specifically applied to testimony in a habeas hearing. In State v. Vega, 163 Conn. 104 (1972) the court held thatSimmons limits the holding to a factual situation where the earlier motion testimony is later offered as substantive evidence to convict. The defendant, in the case at bar, concedes that if the defendant chooses to testify, his habeas testimony could be used against him for impeachment purposes. However, at least by implication, the defendant urges the court not to admit the prior habeas testimony for substantive purposes on the issue of guilt. The court agrees with the defendant.
The Simmons court recognized that the prior testimony may have been voluntary in the abstract sense. This court can understand the claim that if the defendant had been properly advised of his fifth amendment rights and in particular if he had voluntarily waived them, then his testimony at the suppression or in this case the habeas hearing was neither involuntary or compelled and should be admitted even for substantive purposes as to the issue of guilt. This appears to be the holding in State v.Castonguay, 218 Conn. 486 (1991) at least as to prior testimony in a trial. However, there does not appear to be a claimed constitutional right in the first trial and more importantly, the defendant conceded that his testimony in his first trial was not CT Page 2917 compelled.
This court finds under Simmons that although the testimony at the habeas hearing may have been voluntary in the abstract sense, it was really involuntary in the actual sense. Regardless of; advisement and waiver of fifth amendment rights, the defendant was compelled to testify to claim his sixth amendment rights. The constitutional right against self-incrimination should not have to be surrendered in order to claim a constitutional right to effective assistance of counsel. Both rights are so fundamental that a defendant is entitled to both. Thus, the court adopts the dissenting opinion of Mr. Justice Marshall in U.S. v. Kahan,415 U.S. 239, 249 (1974) that "Where the government requires the defendant to speak in order to assert his sixth amendment rights, it must shelter him with immunity provided by the fifth amendment for such compelled testimony."
Accordingly, the Motion to Suppress V is granted except that if the defendant chooses to testify in this case, his habeas testimony can be used against him for impeachment purposes.
This ruling makes the claims that failure to advise defendant of his fifth amendment rights and failure to sufficiently canvass the defendant as to the waiver of these rights irrelevant. However, if either party wishes a decision on these claims, the court will leave it open for that decision to be requested.[4]
Rittenband, Judge