RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0251p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

          *v.*                                          No. 11-6311

FELIX BOOKER,
          *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 3:10-cr-44-1—Robert Leon Jordan, District Judge.

Argued: October 9, 2012

Decided and Filed: August 26, 2013

Before: GILMAN, GIBBONS, and ROGERS, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Robert L. Jolley, Jr., JOLLEY & ELDRIDGE, Knoxville, Tennessee, for Appellant. Debra A. Breneman, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee. **ON BRIEF:** Robert L. Jolley, Jr., JOLLEY & ELDRIDGE, Knoxville, Tennessee, for Appellant. Alexandra Hui, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee.

ROGERS, J., delivered the opinion of the court, in which GILMAN, J., joined. GIBBONS, J. (pp. 20–25), delivered a separate dissenting opinion.

———————————

## OPINION

———————————

ROGERS, Circuit Judge. Felix Booker was convicted of possession of a five-ounce rock of crack cocaine, which he had hidden in his rectum. Police officers, reasonably suspecting that Booker had contraband hidden in his rectum, took Booker to an emergency-room doctor. The doctor, using a procedure that Booker did not consent

to, intubated Booker for about an hour, rendered him unconscious for twenty to thirty minutes, and paralyzed him for seven to eight minutes. Using a finger, the doctor found and removed the crack cocaine, and turned it over to the police. Even though the doctor may have acted for entirely medical reasons, the unconsented procedure while Booker was under the control of the police officers must, in the circumstances of this case, be attributed to the state for Fourth Amendment purposes. The unconsented procedure, moreover, shocks the conscience at least as much as the stomach pumping that the Supreme Court long ago held to violate due process. The evidence resulting from the procedure should accordingly have been excluded, and Booker's conviction must be reversed.

## I.

At approximately 11:50 a.m. on August 12, 2010, Daniel Steakley, a K-9 officer with the Oak Ridge Police Department ("ORPD"), pulled over a car with expired tags. William Booker, the defendant's brother, drove the car; Felix Booker rode in the front passenger's seat. While speaking with William Booker, Steakley smelled marijuana. William Booker denied that there were illegal drugs in the car and told Steakley he was free to search the vehicle. Prior to conducting the search, Steakley went to the police cruiser to check William Booker's driver's license status and to ascertain the existence of any outstanding warrants with the police dispatcher. As Steakley did so, he noticed Felix Booker "moving around, as if he was attempting to conceal something." This was not the first encounter between Felix Booker and Steakley. In 2009, Steakley had arrested Booker and recovered thirteen bags of marijuana that Booker hid in his crotch.

After completing the driver's license and outstanding warrants checks, Steakley utilized his trained drug-sniffing dog. The dog alerted near the front passenger-side door of the car where Felix Booker was seated. Steakley asked Booker to exit the car and patted him down. During the search, Steakley noticed that Booker "cl[e]nched his butt[ocks] together" when he patted him in that area, but the pat-down produced no drugs. However, Steakley did feel two large bulges in Booker's pockets which turned out to be large amounts of currency. During the search of the front passenger's seat,

Steakley recovered three small plastic bags: one that contained .06 grams of marijuana, another that contained "a green plant-type residue," and a third covered with a "powder residue." Steakley also noticed marijuana "ground up into the floor" of the passenger-side seat.

Steakley arrested Felix Booker for felony possession of marijuana, despite being unable to recover enough marijuana to justify such an arrest under Tennessee law. *See* Tenn. Code Ann. § 39-17-418(b) (defining marijuana possession below 14.175 grams as a misdemeanor offense); § 40-7-118(b)(1) (authorizing citation, but not arrest, when an officer witnesses a misdemeanor). Steakley handcuffed Booker with his hands behind his back and placed him in the cruiser of another ORPD officer, Lewis Ridenour, so that Booker could be taken to the police station. Ridenour left the scene at approximately 12:19 p.m. The officers allowed William Booker to depart without issuing a citation for his expired plates and without trying to recover the marijuana in the floorboard.

Ridenour and Booker arrived at the police station at 12:21 p.m., followed shortly thereafter by Steakley. Steakley placed Booker in an interview room at the station. After Steakley read Booker his *Miranda* rights, Booker offered to forfeit the money Steakley found in Booker's pockets in order to be released on citation, while claiming that he earned the cash pouring concrete. Ridenour also noticed that Booker was "fidget[ing] and try[ing] to put his hands in the back of his pants," prompting Ridenour to move Booker's handcuffs from his back to his front. When Ridenour stepped out of the interview room for a moment, Booker slammed the door shut and leaned against the door to barricade it. Ridenour, Steakley, and a police sergeant forced themselves into the interview room and wrestled Booker to the ground to regain control over him. The officers searched the room for contraband, patted down Booker a second time, and shook his pants by pulling them up until they were loose and jarring them to dislodge any articles jammed "inside of his pants or in [his] boxers." The officers did not find anything.

Ridenour next took Booker to the Anderson County Detention Facility in Clinton, Tennessee, arriving at approximately 1:20 p.m. According to Ridenour, Booker

fidgeted throughout the drive. Upon arrival, Ridenour discussed Booker's situation with Jerry Shelton, a sheriff's deputy. The detention facility did not have a policy of strip searching all new detainees, and there is no indication whether Booker was going to be placed in the general population of the facility. However, based on suspicion, Shelton agreed to strip search Booker to determine if he was concealing contraband in his buttocks. Shelton and another officer took Booker into a small room where newly booked inmates typically showered, asked him to remove his clothing, and performed a visual inspection of his body. Shelton asked Booker to bend over and spread his buttocks; when Booker complied, Shelton claimed he could see "a small string protruding from [Booker's] anus." *Id.* at 109. After Shelton asked Booker about the object, Booker moved his hand to cover the area and tried to push the object further into his rectum. This led to another altercation during which Booker had to be restrained by officers. Shelton's supervisor ordered him to take Booker to a hospital immediately.

At 2:28 p.m., sheriff's deputies transported Booker to Methodist Medical Center in Oak Ridge. Booker was shackled and covered only in a blanket because the officers did not believe there was sufficient time to get him dressed. Shelton rode in the backseat alongside Booker, and said Booker was "squirmish" and "trying to go to the rear end of his body and force something further up into" his rectum. In the meantime, Officer Steakley had traveled separately to the hospital. Before Booker arrived, Steakley told Dr. Michael LaPaglia, the attending physician in the emergency room, that Steakley strongly suspected that Booker had drugs in his rectum.

This was not the first time that officers had brought a suspect to LaPaglia so that he could perform a digital rectal examination, that is, a procedure in which a physician inserts a finger into the patient's anus to probe the rectum. This was the third time that officers with the Anderson County Sheriff's Department had sought LaPaglia's assistance with this type of procedure within three years.

At 2:50 p.m., the cruiser arrived at the hospital. Although Booker denied having anything in his rectum, had no physical symptoms, and had normal vital signs, LaPaglia proceeded without waiting. According to LaPaglia, the possibility of an individual

hiding drugs in his rectum raised "a number of concerns" because "[t]he rectum is a part of the body that absorbs drugs very readily," and at a high dosage, such absorption may be fatal. LaPaglia asserts that this is true even when a person does not initially manifest symptoms of drug absorption, since "the drug could possibly not be absorbed enough at that time for [a physician] to see any signs of the drug." In the presence of Steakley, Ridenour, Shelton, and an unnamed officer, LaPaglia "explained to [Booker] what my position was as an emergency physician and that there was suspicion that he had some sort of drug in his rectum and that as an emergency physician I had to assure that he did not, and if he did, that I had to remove it because his life could be in danger."

Booker—still naked and handcuffed—denied hiding drugs in his rectum and refused to submit to a digital rectal examination. LaPaglia replied that Booker "really did not have a choice because if my suspicion was high enough to think that he had some sort of dangerous substance in his rectum, then it was my duty to get it out." LaPaglia recalled that the officers did not direct him to do anything to Booker. During the suppression motion hearing, LaPaglia reiterated that his "duty" was medical in nature:

> Q.     . . . . In a situation where you suspect somebody to have narcotics inside them, can you in such a life-threatening situation take any lack of consent at face value?
> A.     No.
> Q.     Why not?
> A.     As an emergency physician, if someone's life is in danger and . . . I feel that the person is not aware of the danger, then I have to take control of the situation and do what I need to do to save their life or prevent any harm to them.

LaPaglia warned Booker that if he did not cooperate, LaPaglia would administer muscle relaxants or, if necessary, paralyze Booker in order to perform the rectal examination.

At this point, LaPaglia claims that Booker gave oral consent to a rectal examination. There is nothing in the medical record indicating consent, and none of the other witnesses present (Registered Nurse Tammy Jones, Officer Steakley, Deputy Shelton, and Booker) testified that any consent was given. Not even LaPaglia contended that Booker consented to the paralyzation procedure.

LaPaglia first performed the rectal examination on Booker without medication. But Booker contracted his anal and rectal muscles while LaPaglia was attempting to examine him, preventing LaPaglia from inserting a finger in Booker's anus. As LaPaglia said, "If an individual does not want you to enter their rectum, you are not going to." *Id.* at 140. LaPaglia ordered a nurse to inject muscle relaxants into Booker's left buttock. On the second attempt, Booker remained uncooperative and LaPaglia could not complete the examination, but he could feel a foreign object inside Booker's rectum, convincing LaPaglia that completion of the rectal examination was imperative. Finally, LaPaglia directed an emergency room nurse, Tammy Jones, to administer a sedative and a paralytic agent to Booker intravenously, and had him intubated to control his breathing. At 4:12 p.m., Booker was intubated. He remained intubated for about an hour, unconscious for twenty to thirty minutes, and paralyzed for seven to eight minutes. While Booker was paralyzed, LaPaglia removed a rock of crack cocaine, greater than five grams, from Booker's rectum. LaPaglia then turned over the crack rock to Officer Steakley, who took it for evidence.

A federal grand jury indicted Booker on one count of possession with intent to distribute more than five grams of cocaine base, 21 U.S.C. § 841(a)(1), (b)(1)(B). Booker moved to suppress the crack cocaine on Fourth Amendment grounds. He argued that Steakley lacked probable cause to arrest him for marijuana possession and that his post-arrest treatment was unreasonable under the Fourth Amendment. Among other reasons, Booker asserted that the digital rectal examination was an unreasonable invasion of his personal privacy, dignity, and liberty to refuse medical treatment.

After holding an evidentiary hearing on the motion, at which Steakley, Ridenour, Shelton, LaPaglia, Jones, and Booker all testified, the magistrate judge recommended denying Booker's motion. The magistrate judge found that all aspects of the traffic stop complied with the Fourth Amendment, and concluded that the digital rectal examination was lawful because it was not a "search" under the Fourth Amendment, and even if it was a "search," LaPaglia and the officers acted reasonably under the circumstances. The

district judge adopted the magistrate judge's recommendations in full. *See United States v. Booker*, No. 3:10-CR-44, 2010 WL 4884675, at *5–*8 (E.D. Tenn. Nov. 24, 2010).

A jury convicted Booker as charged on February 2, 2011. This appeal followed.

## II.

Booker's Fourth Amendment rights were violated. The officers brought Booker to LaPaglia and stood by while LaPaglia performed a highly intrusive and dehumanizing procedure on Booker without his consent. On the facts of this case, LaPaglia's actions are attributable to the state government and were so unreasonable as to shock the conscience. Because this conduct is sufficiently deliberate and culpable, suppression of the evidence was a proper remedy.

### A. *State Action*

First, the officers' participation, knowledge, and custody created a sufficiently close nexus to make LaPaglia's conduct attributable to the police. The Fourth Amendment provides that "[t]he right of the people to be secure in their persons . . . against unreasonable searches . . . shall not be violated." U.S. Const. amend. IV. This provision is understood to refer to searches by, or made possible by, government officers. It is true that, as the Supreme Court stated in *United States v. Jacobsen*, 466 U.S. 109, 113 (1984), the Fourth Amendment is "wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official." (internal quotation marks omitted). But that is not the case here.

When police officers bring a suspect in custody to a purportedly independent actor, and stand by without interfering while the actor unlawfully batters the subject in a way that the police clearly could not, it can hardly be argued that resulting evidence is admissible. In some circumstances this must be true no matter what the intent of the independent actor. Otherwise, for instance, police could take a suspect to a local town thug who enjoyed beating people up, and let the suspect take a pounding until he gave the location of the loot. This would make no more sense than putting the suspect in a

lion's cage, and saying that the lion, in scratching the suspect, was acting independently because it did not intend to help the police. In these situations, of course, the police could not merely stand by, and if they did so, their actions would incur Fourth Amendment responsibility. A contrary rule would eviscerate fundamental Fourth Amendment protections.

As the Supreme Court has indicated, whether a private individual's conduct is imputed to the government "turns on the degree of the Government's participation in the private party's activities, a question that can only be resolved 'in light of all the circumstances.'" *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 614–15 (1989) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 487 (1971)). LaPaglia must be treated as a government agent for Fourth Amendment purposes because the suspect was in the physical control of the police, the police knew what LaPaglia was going to do, the police knew that Booker did not consent, and a reasonable police officer would know that the doctor did not, independent of police direction, have the legal authority to intubate and paralyze the suspect without his consent.

The Government does not really contest that Booker was in the physical control of the police, or that the police knew what LaPaglia was going to do.

The district court did suggest that Booker consented, but nothing in the record reflects that Booker authorized the performance of the digital rectal examination with paralysis and intubation.[1] Despite the absence of anything indicating consent in the medical record or in the testimony of any other witness who was present during the procedure (Registered Nurse Tammy Jones, Officer Steakley, Deputy Shelton, or Booker), the district court appears to have credited LaPaglia's testimony that Booker consented. However, the Report and Recommendation's statement that Booker "agreed to submit to a [digital rectal examination]" does not make any indication of the scope of the consent that Booker gave.

---

[1] The Report and Recommendation states "LaPaglia asked the Defendant for his consent to a digital rectal examination ('DRE'). The Defendant initially refused, but then agreed to submit to a DRE." Report and & Recommendation, 10. The district court adopted the Report and Recommendation "in its entirety." *Booker*, 2010 WL 4884675, at *8.

To find that Booker gave informed consent to intubation and the use of paralyzing drugs is not possible based on the record. According to LaPaglia's testimony, he explained the situation to Booker as follows:

> A: I told him that I needed to do a rectal exam. I asked him if I could do so. Initially he said, no. I explained to him that at this point in the Emergency Room he really did not have a choice because if my suspicion was high enough to think that he had some sort of dangerous substance in his rectum, then it was my duty to get it out. And that we could do it a number of different ways. I told him that I would prefer if he cooperated and allow me to do the rectal exam, but if he did not cooperate, then I was going to be forced to administer medications to relax him so that I can do the rectal exam.
>     *I further explained that if that did not work, then I would have to go to the extreme and actually paralyze him in order to do the rectal exam. I told him that I did not want to go that far. I would rather that he cooperate and we just do the rectal exam and get it over with.* At that point he agreed to do the rectal exam.
> . . . .
> Q. What happened during this exam?
> A. The patient got into the proper position. I prepared to do the rectal exam. He would not allow me to do so. He contracted his anal and rectal muscles so that I could not get my finger inside of his rectum.
> Q. This was absent any sort of sedation?
> A. Correct.
> Q. Then what happened?
> A. As I initially told him, if he did not cooperate, I was going to have to give him medication to sedate him in order to do the exam. After the initial attempt to do the exam which failed, I then ordered the nurse to administer ten milligrams of a drug called Midazolam which usually sedates an adult enough to relax all of their musculature so I can do the exam.
> Q. Did you in fact sedate the defendant?
> A. I did.
> Q. What happened after he was sedated?
> A. I waited approximately ten to 15 minutes for the medicine to take full effect. I reattempted the rectal exam.
> Q. What happened on your reattempt?
> A. I was more successful in getting into his rectum at that point because he was sedated and with the tip of my finger I could feel a foreign object in his rectum. He was still conscious enough to contract his muscles enough so that I could not do a complete rectal exam and remove the object.
> Q. So what step did you take next?

> A. At that point I was convinced beyond any doubt that there was something in his rectum and that I had to do whatever was necessary to get it out. I went to the next step which I had explained previously to the patient and that was to do paralysis. I administered a combination of medications which paralyze every muscle in the body and I also had to stick a tube down his lungs in order to take over his breathing, basically to control his physiology and keep him alive while he was paralyzed.

(Emphasis added.)

LaPaglia directly testified that consent was not given for the use of the paralyzing drug, Succinylcholine. In response to defense counsel's question, "Did Mr. Booker consent for you to use [Succinylcholine] in order to remove this object?", LaPaglia answered "No."

Viewing the evidence in the light most favorable to the Government, it appears that the most that Booker may have verbally consented to was an undrugged digital rectal examination as a way to avoid being paralyzed by LaPaglia. LaPaglia went beyond even the broadest view of consent and used a paralyzing drug which he admitted Booker did not consent to. On the entire evidence, Booker did not consent to a digital rectal examination with paralysis and intubation.

Finally, no reasonable police officer could believe that, without direction from the police, and over the clear refusal to consent by a conscious and competent patient, a doctor could lawfully go ahead and perform such a procedure. Even if LaPaglia was motivated by benevolent medical ideals, his actions in paralyzing and intubating Booker and performing a rectal examination without his express or implied consent constitute medical battery. Indeed, under Tennessee law, there is medical battery if "the patient [did not] authorize performance of the procedure." *Blanchard v. Kellum*, 975 S.W.2d 522, 524 (Tenn. 1998). There is of course a privilege generally recognized in tort law for doctors to deliver medically indicated emergency care when the patient cannot make the choice pro or con, often because the patient is unconscious. Dan B. Dobbs, *The Law of Torts*, § 106, at 247 (2000); *see also Restatement (Second) of Torts* § 892D & cmt. a. Tennessee apparently accepts this exception to the consent requirement. *See Ray v. Scheibert*, 484 S.W.2d 63, 71 (Tenn. Ct. App. 1972). In this case, however, not only was

Booker conscious when he was presented to LaPaglia, but Booker's statements in no way indicate authorization of the intubate-and-paralyze procedure. This distinguishes Booker's case from a situation in which the police present an unconscious suspect to a hospital. *See, e.g., United States v. Black*, No. 88-5266, 1988 WL 107375 (6th Cir., Oct. 14, 1988).

In short, the police effectively used Dr. LaPaglia as a tool to perform a search on Booker's person. In these particular circumstances, Dr. LaPaglia's medical purposes do not immunize the procedures from Fourth Amendment scrutiny.

The two cases the Government relies on in this connection do not compel a different result. The Government relies upon *United States v. Lambert*, 771 F.2d 83, 89 (6th Cir. 1985), and the Ninth Circuit's holding in *United States v. Attson*, 900 F.2d 1427, 1431–33 (9th Cir. 1990).

The language relied upon in *Lambert* is dictum, and relies on a case that is distinguishable. In *Lambert*, the defendant hired a housekeeper who observed evidence of drug use. Motivated by concerns about the negative effects of drug use, the housekeeper contacted the FBI, and by her own volition and without suggestion from the FBI, took contraband from Lambert's home and gave it to the FBI. *Lambert*, 771 F.2d at 86. We upheld the denial of a suppression motion. In doing so, we recognized the Supreme Court's holding that the Fourth Amendment "does not apply to a search or seizure, even an unreasonable one, conducted by a private individual not acting as an agent of the government or with the participation or knowledge of any governmental official." *Id.* at 89 (citing *United States v. Jacobsen*, 466 U.S. 109 (1984); *Coolidge*, 403 U.S. at 487). We stated two requirements for finding that a person is acting as a police agent for Fourth Amendment purposes: "First, the police must have instigated, encouraged, or participated in the search. Second, the individual must have engaged in the search with the intent of assisting the police in their investigative efforts." *Id.* (citation omitted). (The first part of this test is met in Booker's case because the officers' role in bringing Booker to the hospital and informing LaPaglia of their suspicion amounted to an instigation of the search.) The Government in Booker's case

assumes without conceding that the first requirement is met, but challenges the second. In *Lambert*, in contrast, our analysis of whether the housekeeper was an agent focused entirely on the first requirement, and conceded that the housekeeper had the intent of assisting the police. The stated requirement that the housekeeper have intended to assist the police was thus entirely unnecessary to our resolution of the *Lambert* case.

The *Lambert* dictum does cite, however, *United States v. Howard*, 752 F.2d 220, 227 (6th Cir. 1985), a case in which a house fire created suspicion of insurance fraud. The Howards' insurance contract permitted the insurance company's investigator to enter the premises, and the investigator did so to look for arson. This much is clearly private action, *see Stone v. Wingo*, 416 F.2d 857, 860–62 (6th Cir. 1969), but state police also participated in the investigation. We held that the testimony of the investigator was admissible because even if the government participated, the insurance investigator's intent was entirely independent of the purposes of a criminal investigation and the insurance investigator was rightfully on the property. *See id.* at 227–28. This holding was adopted by this court sitting en banc. *See United States v. Howard*, 770 F.2d 57, 62 (6th Cir. 1985) (en banc). The actions of Dr. LaPaglia, in contrast to those of the investigator in *Howard*, were not colorably lawful because of the clear lack of consent. Moreover, the access to the property was not "presented" to the investigators in the way that Booker was presented to LaPaglia. The *Howard* case would be more analogous to Booker's case if the police officers in *Howard* had had exclusive control of access to the premises and had permitted the private investigator to enter, with the police having objective knowledge that neither the police nor the private investigator had a right to enter the premises. The facts in *Howard* were far from that. In *Howard*, the insurance investigator would have investigated the charred remains of the Howards' house even without police participation.

Indeed, we distinguished *Howard* on similar grounds in *United States v. Hardin*, 539 F.3d 404, 417–20 (6th Cir. 2008). In that case, we held that for Fourth Amendment purposes an apartment manager became an agent of the government when officers requested that the manager enter an apartment to verify the presence of a suspect. The

government argued that upon learning about his tenant's criminal record, the manager had an independent business motivation for entering the apartment. *Id.* at 417. We distinguished *Howard* on the ground that in *Howard*,

> "[t]he insurance company investigator was rightfully on the property to determine the liability of the insurance company" in light of a consent clause in the insurance contract. *Howard,* 752 F.2d at 227–28. Here, in contrast, Tennessee law provides that a "landlord may enter the dwelling unit without consent of the tenant *in case of emergency*" and defines emergency as "mean[ing] a sudden, generally unexpected occurrence or set of circumstances demanding immediate action." Tenn. Code Ann. § 66–28–403(b). The officers' mere suspicion that a fugitive felon might be on the premises does not constitute an emergency, and, even if it did, surely the "immediate action" contemplated would not include the landlord's unarmed, unescorted entry into the unit where the fugitive was suspected to be.

*Id.* at 418 (modification in original). Just as the landlord in *Hardin* could not enter the premises in the absence of an emergency under Tennessee law, Dr. LaPaglia could not intubate and paralyze a conscious and competent Booker except with consent under Tennessee law. *Howard* does not control Booker's case.

Finally, the lack of Booker's consent also distinguishes the Ninth Circuit case upon which the Government relies, *United States v. Attson*, 900 F.2d 1427 (9th Cir. 1990). In *Attson*, the suspect consented to removal of blood for medical purposes. *See id.* at 1429. The Ninth Circuit indeed reasoned that "the fourth amendment will not apply when the private party was acting for a reason that is independent of [an investigative or administrative] governmental purpose." *Id.* at 1433. But the court went on to explain the underlying purpose for such a requirement: "to ascertain the motives underlying governmental conduct that is purportedly subject to the fourth amendment." *Id.* The actions of the police in standing by while a suspect in custody is medically treated against his will go directly to the motives underlying governmental conduct in a way that a consensual taking of blood, or other consented treatment, does not.

This case is the unusual one in which the police effectively use a doctor who is known to conduct unconsented intrusive procedures when suspects in custody are

presented by the police. In this context, the doctor's intent to provide medical care, assuming it is genuine, does not relieve the police of responsibility. A holding of government responsibility does not conflict with our holding in *Howard* or the Ninth Circuit's holding in *Attson*. Focusing too much on the language of those cases and not on the actual holdings would turn them into an engine for circumventing the Fourth Amendment.

Our holding is supported by decisions in other circuits, which require that a private actor's independent motivation be "legitimate." *Kartorie v. Dunham*, 108 F. App'x 694, 699 (3d Cir. 2004); *United States v. Souza*, 223 F.3d 1197, 1202 (10th Cir. 2000); *United States v. McAllister*, 18 F.3d 1412, 1418 (7th Cir. 1994); *United States v. Walther*, 652 F.2d 788, 792 (9th Cir. 1981). Thus, even looking at Dr. LaPaglia's motivation, it was illegitimate in the following sense: A doctor who was solely interested in resolving the "medical emergency" could have given Booker the option of privately using a toilet (although thereby disposing of the evidence). The doctor's failure to present such a choice showed that he was acting at least in part to ensure retrieval of the hidden drugs.

Of course the responsibility of the government does not mean that the search results must be suppressed. If police take a suspect in custody to a doctor and require the suspect to be searched by a doctor against his consent, this is permissible if the search is constitutionally reasonable. That is the next question.

B. *Reasonableness of the Search*

A comparison of this case to *Rochin v. California*, 342 U.S. 165 (1952), and *Winston v. Lee*, 470 U.S. 753 (1985), shows that the digital rectal examination was unreasonable. In *Rochin*, three deputy sheriffs forced their way into Rochin's bedroom based on information that Rochin was selling narcotics. The deputies saw two capsules sitting on his nightstand and asked Rochin whom the capsules belonged to. In response, Rochin grabbed the capsules and swallowed them. The deputies then handcuffed Rochin and took him to the hospital where the police directed a doctor to force "an emetic solution through a tube into Rochin's stomach against his will." *Id.* at 166. The stomach

pumping caused Rochin to vomit up the two capsules, which were found to contain morphine. The Supreme Court held that Rochin's conviction for possessing these morphine tablets was so fundamentally unfair as to violate the Due Process Clause. The Court said the deputies' conduct "shocks the conscience" and was "too close to the rack and screw to permit of constitutional differentiation." *Id.* at 172.

The similarity between the present case and *Rochin* is apparent. While factual and legal differences exist, what shocked the conscience in *Rochin* was the use of the forced emetic. Forced paralysis, intubation, and digital rectal examination is at least as shocking as stomach pumping. The main legal difference is that *Rochin* analyzed the practice under the "fundamental fairness" standard of the Due Process Clause of the Fourteenth Amendment, while Booker bases his challenge on the Fourth Amendment's prohibition of "unreasonable searches," which applies to the states via the Due Process Clause of the Fourteenth Amendment. *See Wolf v. Colorado*, 338 U.S. 25, 28 (1949). However, this difference is immaterial because investigative conduct that would shock the conscience for purposes of the Due Process Clause is "unreasonable" for purposes of the Fourth Amendment. As the Supreme Court explained in *County of Sacramento v. Lewis*, 523 U.S. 833, 849 n.9 (1998), under modern doctrine, *Rochin* "would be treated under the Fourth Amendment, albeit with the same result." In short, the present case cannot be distinguished from *Rochin* in any meaningful way. Booker was subjected to an unreasonable search in violation of his Fourth Amendment rights.

This conclusion is squarely supported by the Supreme Court's holding in *Winston v. Lee*, 470 U.S. 753 (1985). In *Lee*, a shopkeeper wounded his assailant during an attempted robbery. Lee was soon found in the neighborhood with a bullet wound to his shoulder and was arrested by the police. The police went to state court to seek an order directing Lee to undergo surgery. The Supreme Court concluded that requiring Lee to undergo surgery involving general anesthesia would be an unreasonable search. *See id.* at 755–56, 767.

In reaching the conclusion that the forced surgery would be unconstitutional, the Court found that the following three factors weighed against its substantive

reasonableness:  (1) "the extent to which the procedure may threaten the safety or health of the individual," (2) "the extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity," and (3) "the community's interest in fairly and accurately determining guilt or innocence."  *Id.* at 761–62.  These factors, taken together, weigh even more strongly against the reasonableness of the procedure used on Booker.

First, the degree of risk is at least comparable to that in *Lee*, which involved a general anesthetic but not a paralyzing agent.  In *Lee*, the Court of Appeals had the benefit of evidence—including an x-ray confirming the presence of the bullet—presented at three hearings.  Based on this evidence, the Court of Appeals had said the risk to Lee was "minimal."  The Supreme Court noted uncertainty about the medical risk and stated that "the very uncertainty militates against finding the operation to be 'reasonable.'"  *Id.* at 764 & n.7, 766.  In this case, Booker emphasizes the risk of the paralysis and intubation while the Government emphasizes the routine nature of the procedure in an emergency room.  As in *Lee*, although the medical risks are apparently not extremely high, they are the subject of dispute, and that very uncertainty may weigh against a finding of reasonableness.  *See id.*

Second, in comparison with *Lee*, the affront to human dignity in this case is compelling.  The Court in *Lee* reasoned:

> When conducted with the consent of the patient, surgery requiring general anesthesia is not necessarily demeaning or intrusive.  In such a case, the surgeon is carrying out the patient's own will concerning the patient's body and the patient's right to privacy is therefore preserved.  In this case, however, the Court of Appeals noted that the Commonwealth proposes to take control of respondent's body, to "drug this citizen—not yet convicted of a criminal offense—with narcotics and barbiturates into a state of unconsciousness," and then to search beneath his skin for evidence of a crime.  This kind of surgery involves a virtually total divestment of respondent's ordinary control over surgical probing beneath his skin.

*Id.* at 765 (quoting *Lee v. Winston*, 717 F.2d 888, 901 (4th Cir. 1983)).  Here, there is not only a probe into a tranquilized subject.  Booker, naked and handcuffed, was paralyzed, intubated, and anally probed without his consent.  As the Fifth Circuit stated in *United*

*States v. Gray*, 669 F.3d 556, 565 (5th Cir. 2012), this type of intrusion "is one of the greatest dignitary intrusions that could flow from a medical procedure." "Such a procedure is degrading to the person being probed—both from his perspective and society's." *Id.*, *vacated on other grounds*, 133 S. Ct. 151 (2012). The affront to personal dignity in Booker's case is categorically greater than what was not permitted in *Lee*.

Third, it is true that society's interest in determining guilt or innocence is "of course of great importance." *Lee*, 470 U.S. at 762. Yet, in *Lee*, the court found retrieval of the bullet not to be a compelling need because other evidence existed. *Id.* at 765–66. This result can be contrasted with another relevant Supreme Court case, *Schmerber v. California*, 384 U.S. 757 (1966), which held blood tests used on suspected drunk drivers to be reasonable. Such blood tests are "highly effective . . . [e]specially given the difficulty of proving drunkenness by other means." *Lee*, 470 U.S. at 762–63. The present case is closer to *Lee* than to *Schmerber* in this respect: it is easier for society to prosecute drug possession crimes without the need for medical procedures than it is to prosecute DUI crimes. Furthermore, while reasonableness under the Fourth Amendment is not a least-intrusive-means test, *see Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 663 (1995), it is relevant that far less intrusive means were available to investigate whether Booker was hiding contraband in his rectum. For example, the established policy of the United States Customs and Border Protection is first to attempt an x-ray to confirm the presence of contraband. If further medical examination is necessary, officers consider whether to engage in a monitored bowel movement, and only engage in an involuntary body cavity search after obtaining a court order. *See* U.S. Customs and Border Patrol, CIS HB 3300-04B, *Personal Search Handbook* (2004), *available at* http://foiarr.cbp.gov/streamingWord.asp?i=7. In this case, LaPaglia testified that he could have done an x-ray. *See* Supp. Hr'g Tr., 138–39, July 18, 2010. When less intrusive means to investigate were available but not used and when the prosecution has other ways to establish guilt, this diminishes the weight that should be given to using an involuntary and invasive medical procedure to further society's interest in fairly and accurately determining guilt or innocence.

The factors applied by the Supreme Court in *Lee* thus compel the conclusion that the search in this case violated the Fourth Amendment. In addition, when there was time to obtain a court order and the police declined to seek one, the suspect's privacy interests should be given particular solicitude.

Supreme Court precedent thus shows that the unconsented paralysis, intubation, and rectal examination amounted to an unreasonable search, which violated Booker's Fourth Amendment rights. We of course do not address cases that may be materially different, such as where the police have obtained a court order, where the police were not aware of the extent of the bodily intrusion, where the police were not aware of the lack of necessary consent, where the suspect was not in the control of the police, where the private actor was independently privileged to act, or where other exigencies were at play.

## C. *The Exclusionary Rule*

Because the officers and LaPaglia were sufficiently culpable in violating Booker's constitutional rights, the exclusionary rule applies notwithstanding the Supreme Court's ruling in *Herring v. United States*, 555 U.S. 135, 141 (2009). That case held that the purpose of the exclusionary rule is to deter officials from violating the Fourth Amendment, and the benefits of deterrence must outweigh the "rule's costly toll upon truth-seeking and law enforcement objectives." *Id.* (quoting *Pennsylvania Bd. of Probation & Parole v. Scott*, 524 U.S. 357, 364 (1998)). "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. . . . [T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Id.* at 144.

In this case, the rule will obviously deter the behavior of the officers who seek to use willing "independent" doctors to probe in cases where a government-directed investigating doctor could not. Indeed, the evidence that this was the third time in three years that LaPaglia assisted the police suggests recurring behavior. This is not a

situation in which the officers relied in good faith on the mistake of a magistrate or judge, *see United States v. Leon*, 468 U.S. 920–21 (1984), or an erroneous entry in a warrant database, *see Herring*, 555 U.S. at 146. It is irrelevant whether the officers and LaPaglia acted in subjective good faith. The "'good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal' in light of 'all the circumstances.'" *Herring*, 555 U.S. at 145 (quoting *Leon*, 468 U.S. at 922 n.23). Based on the circumstances of this case, a reasonably well-trained officer and physician would have known that the search was unlawful.

## III.

The Government argues neither that the officers would have inevitably discovered the crack cocaine, nor that admission of the evidence was harmless error. Because the paralysis, intubation, and digital rectal examination violated Booker's Fourth Amendment rights, we have no need to address Booker's other arguments.[2] We vacate Booker's conviction and sentence, and remand to the district court for further proceedings consistent with this opinion.

---

[2]Booker's other suppression arguments—that his initial arrest was not supported by probable cause and that the police did not have a clear indication that contraband would be found in his rectum—would provide at most alternative bases for suppression of the crack cocaine. Our vacatur of Booker's conviction and sentence makes it unnecessary to reach his argument that he was sentenced improperly. Should Booker be convicted with admissible evidence, he can be sentenced consistent with the Fair Sentencing Act of 2010, Pub. L. No. 111-220, 124 Stat. 2372. *See Dorsey v. United States*, 132 S. Ct. 2321 (2012).

———————————

**DISSENT**

———————————

JULIA SMITH GIBBONS, Circuit Judge, dissenting.  I respectfully but emphatically disagree with the majority's conclusion that LaPaglia was a "state actor" for Fourth Amendment purposes.  In its ruling, the majority draws factual inferences not permitted by this record and imposes a duty on law enforcement officers to interfere with the work of physicians that is not in accord with reality, good judgment, or the law. Because I would decide the "state actor" issue differently, I would not reach the question of whether the "search" LaPaglia performed was reasonable.  I therefore dissent.

**I.**

The majority opinion hinges on the premise that "the police knew what LaPaglia was going to do" when they decided to take Booker to the Methodist Medical Center ("Methodist"). (Maj. Op. at ¶ 27.)  It argues that "[t]his case is the unusual one in which the police effectively use a doctor who is known to conduct unconsented intrusive procedures when suspects in custody are presented by the police." (*Id.* at ¶ 60.)  The only record evidence asserted in support of this claim is LaPaglia's testimony that the Anderson County Sheriff's Department had sought LaPaglia's assistance in removing foreign objects from individuals in its custody on three occasions in the three years prior to his testimony at the suppression hearing. (*Id.* at ¶ 9; *see also* R. 32, Suppression Hr'g Tr., at #245.)

The majority leaps from this testimony to unwarranted inferences about its import.  First, and most importantly, LaPaglia's testimony is no evidence at all with respect to the officers in *this* case.  There is no indication that the officers involved in Booker's arrest and search had any knowledge of these prior incidents, and the conduct or knowledge of different deputies on different occasions cannot be imputed to them. Indeed, there is no evidence that any of the officers involved  in this case had even met LaPaglia before the incident.  The first known interaction between LaPaglia and any of the officers involved in this case came when Steakley arrived at the hospital and told

LaPaglia about Booker's impending arrival. Moreover, LaPaglia's admission is ambiguous as to whether it refers to the removal of objects from rectal cavities generally, or to the particular tactics he used to remove the crack cocaine from Booker's rectum. The statement also sheds no light on whether LaPaglia was able to obtain consent before performing an anal cavity search on these three prior occasions. Booker did not develop a record in the district court about the officers' awareness of LaPaglia's previous interactions with the Sheriff's Department or LaPaglia's conduct on these previous occasions. The majority can only reach its conclusion about what the officers knew in this case by making numerous assumptions that lack support in the record. These assumptions are especially problematic on appeal because of our obligation to review the record in the light most favorable to the party that prevailed below—in this case, the government. *United States v. Campbell*, 549 F.3d 364, 370 (6th Cir. 2008).

Furthermore, the record amply supports the district court's conclusion that the officers believed Booker had a serious medical issue requiring the attention of a physician. Shelton testified that after Booker's strip search all but confirmed he had a foreign object in his rectum, he "figured it was a medical situation" and reported the matter to his supervisor at the county jail. (R. 32, Suppression Hr'g Tr., at #211.) His supervisor told him to "take the defendant right to the hospital for his safety." (*Id.* at #212.) Ridenour also testified that the jail supervisor instructed them to "transport[] [Booker] to Methodist Medical Center" after the strip search. (*Id.* at #188.) There is no testimony supporting the idea that the officers intended to retain LaPaglia specifically or a doctor with similarly low ethical standards generally for the sole purpose of conducting an unlawful evidentiary search. It is also difficult to understand how the officers could have harbored such an intent. There is no evidence in the record suggesting that the officers knew that LaPaglia was a physician at this hospital, that he would be on duty at the precise time they concluded Booker was in need of medical attention, or that doctors at Methodist's emergency room had a history of assisting law enforcement in unlawful searches. Finally, all observers of this incident agreed that LaPaglia, not the officers, made the decision to pursue the anal cavity sweep to the point of intubating and paralyzing Booker. While the officers explained Booker's situation

to LaPaglia, they did not attempt to dictate his treatment methods. A district judge ruling on this question in the first instance may have been able to infer a tacit agreement between the officers and LaPaglia, but that is not a conclusion a panel of this court may draw when reviewing an order denying a motion to suppress.

I agree with the majority that law enforcement officers may not present a criminal suspect to a doctor who, like the "local town thug," (Maj. Op. at ¶ 26), they know with some certainty will perform acts on the defendant the police could not perform themselves without violating the Fourth Amendment. But the record, read with the proper standard of review in mind, does not support this view of the case. The district court reasonably found that the officers took Booker to the emergency room because they believed he had a serious health problem. There is no evidence that the officers had met LaPaglia prior to this incident, knew he would be at the emergency room they took Booker to at that particular time of day, or knew that he had previously worked with the Sheriff's Department. In the absence of a record establishing these facts, the premise that LaPaglia was a mere "tool" of the officers is unsupportable.

## II.

I also take issue with the majority's conclusion that because a reasonable officer "would know that [LaPaglia] did not, independently of police direction, have the legal authority to intubate and paralyze the suspect without his consent," LaPaglia's actions should be imputed to the officers. (Maj. Op. at ¶ 27.) The unlawfulness of LaPaglia's actions standing alone is not relevant to analyzing whether or not he was a state actor. The state action doctrine "turns on the degree of the Government's participation in the private party's activities," not the nature of those activities. *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 614–15 (1989). Nonetheless, as the majority argues, when a private individual engages in patently unlawful conduct in the presence of law enforcement and reasonable officers would understand they had a duty to stop that conduct, that person should be deemed a "state actor" for Fourth Amendment purposes. The majority's analogy to the village "thug" is again instructive. If the police handed a suspect over to such a person, and that person began to "batter[] the subject in a way that the police

clearly could not," the officers would be responsible for allowing that beating to happen, even if they were not aware of the thug's intentions from the outset. (Maj. Op. at ¶ 26.)

But the majority's analogy does not decide this case. Doctors are not thugs; they are legally licensed professionals trained to handle sensitive medical matters. Law enforcement officers rightly defer to their judgment in their area of expertise. Unfortunately, there are doctors who will abuse that trust, which is precisely what happened in this case. LaPaglia told the officers that Booker was in a life-threatening situation and that if LaPaglia did not perform an anal cavity sweep, Booker's life was at risk. He also told them that because this issue was potentially fatal, he had an obligation as a physician to remove the foreign object lodged in Booker's rectum even if Booker refused consent to the procedure. A reasonable officer, untrained in medicine or medical ethics, is not in a position to second-guess these assertions and should not be disciplined for failing to do so through the suppression of evidence.

The majority argues that LaPaglia created a false dilemma for the officers, that he had no legal right to do what he did to Booker without Booker's consent, and that less intrusive measures for obtaining evidence were available to the officers. I agree with all of these points, but I do not believe that they resolve this case. The issue here is not whether a more reasonable option for obtaining evidence that did not offend Booker's personal autonomy was available in the abstract, but whether the officers are responsible for LaPaglia's conduct solely because they accepted his assessment of the situation. The district court correctly answered this question in the negative. A doctor should not be considered the agent of law enforcement officers who fail to intervene in his treatment of a prisoner absent evidence that the officers understood the doctor's representations and actions were made in bad faith. No such evidence exists in this case. I therefore cannot accept the majority's conclusion that the officers should share in LaPaglia's culpability for the manner in which he conducted the medical examination.

**III.**

The majority's position reflects its concern that failure to suppress evidence in cases like these will "eviscerate fundamental Fourth Amendment protections." (Maj. Op. at ¶ 26.)  That concern is a weighty one. I agree with the majority that when a defendant can demonstrate law enforcement officers used a physician as a mere instrument for performing searches they could not perform themselves, it is appropriate to suppress evidence the physician recovers.  But the suppression remedy does not exist to punish unlawful conduct generally.  It is meant to deter misconduct by law enforcement that is "sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring v. United States*, 555 U.S. 135, 144 (2009).  By punishing the officers in this case for a physician's misconduct merely because the officers deferred to a doctor's representations about a medical issue, the majority takes the exclusionary rule far beyond its permissible bounds.

Such an expansion is particularly unnecessary in this case because doctors already face substantial legal deterrents for engaging in conduct that would violate the Fourth Amendment if undertaken by state officers.  For instance, a doctor may face civil liability under a medical battery theory if a physician performs a procedure on a patient against his will.  *See Blanchard v. Kellum*, 975 S.W.2d 522, 524 (Tenn. 1998) ("Performance of an unauthorized procedure constitutes a medical battery.").  A doctor could also face disciplinary action from the Tennessee Board of Medical Examiners for engaging in such conduct.  *See* Tenn. Code Ann. 63-6-214(b)(4) (granting the Board authority to discipline a physician on the grounds of "[g]ross health care liability or a pattern of continued or repeated health care liability, ignorance, negligence or incompetence in the course of medical practice").  Few doctors will be willing to countenance such risks in order to help the police obtain evidence, and broad application of the exclusionary rule is unnecessary to dissuade them from performing unlawful searches.

**IV.**

For these reasons, I would conclude that LaPaglia was not a "state actor" under the Fourth Amendment.  I would therefore affirm the judgment of the district court.  I respectfully dissent from the majority's contrary holding.